Bruce Karpati
Chief, Asset Management Unit
New York Regional Office
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center, Room 400
New York, NY 10281
(212) 336-0174 (Stoelting)
Attorney for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **12 CIV 5028** |
| Plaintiff, | : |
| | : |
| -against- | : |
| | : |
| HARBINGER CAPITAL PARTNERS LLC; | : |
| PHILIP A. FALCONE; and PETER A. JENSON, | : |
| | : **COMPLAINT** |
| | : |
| | : |
| Defendants. | : |
| | : |
| | : |

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

defendants Harbinger Capital Partners LLC ("Harbinger"), Philip A. Falcone ("Falcone"), and

Peter A. Jenson ("Jenson") (collectively, the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.  In breach of their fiduciary duties, Falcone and Harbinger engaged in two fraudulent

schemes that disadvantaged investors and elevated Falcone and Harbinger's interests above the

interests of the funds they advised.  Jenson aided and abetted one of the fraudulent schemes.

2.  *First*, Falcone and Harbinger, aided and abetted by Jenson, engaged in a fraudulent

scheme to misappropriate $113.2 million from a Harbinger fund in order to pay a personal tax

obligation owed by Falcone.  Instead of paying his personal taxes with his own assets, which may have required Falcone to curtail his lifestyle and personal expenditures, Falcone obtained $113.2 million from a hedge fund that Falcone and Harbinger managed during a period when Harbinger had precluded investors in the fund from redeeming their interests.  The Defendants neither sought nor obtained investor approval for the related party transaction.  Having structured the transfer of fund assets to Falcone as a loan with a highly favorable interest rate, Falcone and Harbinger, aided by Jenson, concealed the related party transaction from fund investors for approximately five months.  To give the appearance of legality, the Defendants engaged a law firm to advise them; however, the Defendants failed to disclose all material information to the law firm.  In addition, the Defendants did not act in accordance with the advice that they did receive from the law firm.

3.  *Second*, in order to obtain investor approval to impose more stringent redemption restrictions on investors in a second Harbinger fund, Falcone and Harbinger engaged in a scheme to grant certain large investors favorable redemption and liquidity terms in return for their vote to approve the restrictions.  Falcone and Harbinger concealed this scheme from the fund's board of directors and the other investors, even though Falcone and Harbinger knew, or should have known, that only the board, and not Falcone or Harbinger, had the authority to grant such preferential rights.

## VIOLATIONS

4.  Harbinger has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts practices and courses of business that constitute violations of Sections 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")

[15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]; Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

5.   Falcone has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices and courses of business that constitute violations of Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]; and Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. In addition, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Falcone is liable as a control person for Harbinger's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)].

6.   Jenson has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices and courses of business that aided and abetted Falcone's and Harbinger's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and Advisers Act Sections 206(1), 206(2) and 206(4) [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

7.   Defendants should be permanently enjoined from violating the provisions of the securities laws described above.  Defendants should also be ordered to disgorge any ill-gotten gains or benefits derived as a result of their violations, whether realized, unrealized or received, and prejudgment interest thereon, and ordered to pay appropriate civil money penalties.  In

addition, Falcone should be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]. The Court should also order any other just and appropriate relief.

## JURISDICTION AND VENUE

8.   The Court has subject matter jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

9.   Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Harbinger, Falcone and Jenson maintained their principal offices in New York, New York at all relevant times, and certain of the acts, transactions, practices and courses of business alleged herein took place in the Southern District of New York.

10.  The Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails and wires, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

## DEFENDANTS

11.  **Harbinger** is a Delaware limited liability company owned and controlled by Falcone. Harbinger is based in New York, New York and became registered with the Commission on March 26, 2012.  Harbinger, directly or indirectly, is the investment adviser to Harbinger Capital Partners Fund I ("HCP Fund I") and Harbinger Capital Partners Special Situations Fund ("SSF").

4

In 2009, Falcone and Harbinger formed three additional funds:  Harbinger Capital Partners Fund II ("HCP Fund II"); Credit Distressed Blue Line Fund ("Blue Line Fund"); and Global Opportunities Breakaway Fund ("Breakaway Fund").

12.  **Falcone**, age 49, is the Senior Managing Director and Chief Investment Officer of Harbinger and is an officer and director of Harbinger Group Inc., a public company.  Falcone started Harbinger in or about 2001 after having worked for several investment banking firms. Under Falcone's control, Harbinger's assets under management peaked at approximately $26 billion in 2008.  Falcone has primary responsibility for all investment and business decisions made on behalf of Harbinger and the Harbinger-managed hedge funds.  Falcone previously held Series 7, 24 and 63 securities licenses.

13.  **Jenson**, age 46, was a Managing Director and the Chief Operating Officer of Harbinger from April 2009 through July 2011.  Jenson is an Australian citizen and resides in Illinois.  Jenson has been a certified public accountant but is currently inactive.  He has active designations as a Charted Accountant and a Chartered Financial Analyst and is licensed by the Australian Securities and Investments Commission.  Jenson previously held a Series 27 securities license.

## RELEVANT ENTITIES

14.  **HCP Fund I**, Harbinger's flagship fund, had approximately $5 billion in assets in the Spring of 2009.  HCP Fund I consists of a Cayman master fund ("HCP Master Fund I") and two feeder funds: Harbinger Capital Partners Fund I, L.P. ("HCP Onshore Fund I"), a Delaware limited partnership, and Harbinger Capital Partners Offshore Fund I, Ltd. ("HCP Offshore Fund I"), a Cayman Islands exempted company.  Two Cayman Islands residents serve as the directors for the HCP Master Fund I and the HCP Offshore Fund I.

15.  **SSF** had approximately $2.4 billion in assets as of December 31, 2009, but has been in liquidation since 2010.  Formed as a Delaware limited partnership in 2006, the general partner of SSF LP is Harbinger Capital Partners Special Situations GP, LLC, a Delaware limited liability company that Falcone owns and controls.

## FACTS

### Defendants' Scheme to Misuse SSF Fund Assets

16.  Putting their own interests ahead of the interests of the fund they advised, Falcone and Harbinger misappropriated $113.2 million in SSF funds to pay state and federal taxes owed by Falcone.  The Defendants engaged an outside law firm ("Law Firm A") to advise on the transaction, but Defendants failed to disclose all material information to Law Firm A and intentionally used Law Firm A as an instrument of the scheme.  In addition, Defendants did not act in accordance with the advice that they did receive from Law Firm A.

17.  The Defendants' scheme was not in the best interests of SSF or its investors.  Prior to withdrawing $113.2 million from SSF, Falcone and Harbinger had blocked other SSF investors for over one year from withdrawing any of their funds.  Falcone and Harbinger imposed the lock-up in or about October 2008, due to potential claims in connection with the 2008 bankruptcy of SSF's prime broker, a Lehman Brothers affiliate.  At the time Falcone obtained the money from SSF, approximately 60 percent of SSF investors had unfulfilled requests to redeem their interests in SSF.

18.  The Defendants' use of SSF funds to pay Falcone's personal expense at the same time Falcone and Harbinger had barred other investors from accessing their funds presented a glaring conflict of interest. Nevertheless, the Defendants did not seek or obtain the approval of SSF investors before misusing $113.2 million in SSF assets.  Neither the SSF offering memorandum

nor the SSF limited partnership agreement expressly permitted such a related party loan. These governing documents, however, did allow Harbinger to appoint an investor committee to approve or disapprove related party transactions. The Defendants, however, never formed such an investor committee. Moreover, they failed to ensure that the interests of SSF and its investors were represented during the negotiation, drafting, execution and implementation of the loan agreement.

19. Five months after the loan, Harbinger disclosed the transaction for the first time in a footnote to SSF's audited financial statements dated March 12, 2010. At that time, Falcone still owed SSF a principal balance of approximately $98 million.

20. In or about June 2010, after the Lehman lock-up ended, SSF began to pay redemptions, but was unable to meet redemption requests (greater than 80 percent of SSF's investors were seeking redemptions). The Defendants nevertheless failed to force Falcone to return the money he had obtained and used from SSF, thereby breaching a key term of the loan agreement with SSF that required Falcone to immediately pay back the funds to avoid adverse effects on SSF investors.

21. Concealing the transaction from SSF's investors for five months benefited Falcone and Harbinger. At the time, Falcone and Harbinger had been soliciting investments in new Harbinger funds – HCP Fund II, the Blue Line Fund and the Breakaway Fund – and disclosure of the loan in the midst of investor solicitations would have impeded these new offerings. In addition, during this five-month period, Falcone and Harbinger requested that SSF investors vote on and approve two restructuring proposals, but concealed from them that Falcone had obtained $113.2 million in fund assets for his personal use. The Defendants were also concerned about negative publicity from the disclosure of the loan and Falcone's financial condition. And

utilizing the loan from SSF rather than personal assets allowed Falcone to continue his lavish

lifestyle.

**Falcone's Personal Tax Obligation Was Expected and Foreseeable**

22.   After disclosing the loan in March 2010, Falcone and Jenson sought to justify their

actions to obtain the loan by telling investors that Falcone's personal tax bill was unexpected and

not the consequence of Falcone's own decisions and planning.  The Defendants, however, knew

at least six months before the loan that Falcone would have a large tax payment due by October

2009.

23.   During 2008, Falcone ignored advice with respect to paying his 2008 tax estimates,

thus laying the foundation for his personal tax liability in 2009.  In the first three quarters of

2008, Falcone deliberately underpaid his estimated 2008 personal taxes by a significant amount.

Moreover, Falcone decided not to make any estimated payment for the fourth quarter of 2008

based on his mistaken assumption that Harbinger fund losses would offset the $488 million

distribution that Falcone had received in early 2008.

24.   On April 14, 2009, Jenson received an email from Falcone's personal accountants

informing him that "[b]ased on our current calculation Philip [Falcone] is still showing a

significant balance due" of approximately $70 million.  By July 2009, the amount due had risen

to more than $100 million.  The Defendants nevertheless failed to pursue measures to resolve

Falcone's tax issue.

25.   In early April 2009, the idea of a loan from a Harbinger fund to pay Falcone's personal

taxes, as well as other obligations, arose during discussions between Harbinger personnel and

Harbinger's longstanding outside law firm ("Law Firm B").  At that time, a partner at Law Firm

B told Harbinger in an email that "[l]ending money to principals is not part of the fund's

investment program."

26. In addition, a Law Firm B partner told Harbinger in a separate e-mail that it would "never be comfortable with this . . . a loan . . . will never be a good idea." Another Law Firm B partner added on the same email that a loan to a principal is "not what investors expect their money to be used for." An in-house Harbinger lawyer forwarded this e-mail to Falcone, stating that "[Law Firm B] is unequivocally against the loan idea for a number of reasons," and Falcone responded "ok."

27. Throughout the Summer of 2009, Falcone failed to take adequate actions to resolve his looming personal tax obligation. The Defendants also never contacted any state or federal tax authorities, such as the Internal Revenue Service, to determine whether Falcone could pay his tax liability in installments. Falcone also decided against accessing hundreds of millions of dollars in deferred compensation.

**Falcone Declined to Pursue Bank Financing**

28. In August 2009, Harbinger personnel contacted officials at a bank (the "Bank"). On September 1, 2009, Jenson met with Bank officials about a loan to pay Falcone's personal tax obligation.

29. During this meeting, Jenson provided financial documents to the Bank showing that Falcone had $55 million available. The Bank and Jenson discussed a potential $50 million loan. The Bank indicated, however, that Falcone's hedge fund interests could not serve as collateral. Indeed, Jenson had been unable to find any bank that was willing to lend at any price against Falcone's SSF interests.

30. At the September 1, 2009 meeting, the Bank told Jenson that Falcone would have to move quickly. Three days after the meeting, Jenson emailed Falcone "with regard to a facility

Case 1:12-cv-05028-PAC   Document 1   Filed 06/27/12   Page 10 of 28



on your total assets as a potential avenue to covering the tax obligation." Jenson further

proposed that Falcone proceed with appraisals of Falcone's two Manhattan townhouses and

artwork. Jenson also raised the possibility of borrowing against other assets, including Falcone's

interest in a National Hockey League team and an estate on the Caribbean island of St. Barts.

31. By early 2009, Falcone had begun extensive renovations on his Manhattan

townhouses, and he also undertook significant personal expenditures, including expenditures

related to a private jet, a security detail, and motion picture investments. In December 2009, just

two months after the loan transaction, Falcone made a capital commitment of $10 million to a

non-Harbinger fund.

32. On September 15, 2009, Falcone responded to Jenson's proposal about the Bank loan

by saying "lets discuss later this week if you have some free time."

33. Although the due date was approaching, and although the proposed loan from the

Bank, combined with Falcone's other liquid assets, provided a potential avenue for Falcone to

pay his personal tax obligation, Falcone did not pursue this option.

34. One proposal that Falcone heard in September 2009, however, did interest him: taking

a loan from SSF using his SSF interest, rather than other personal assets, as collateral. Jenson

presented the proposal following discussions with a partner at Law Firm A. On September 15,

2009, Jenson emailed Law Firm A regarding the SSF loan proposal, stating "[P]hil [Falcone]

loves the idea . . . Need a term sheet asap."

35. Law Firm A emailed a draft term sheet to Jenson, but cautioned that such a transaction

"shall only be made upon the determination [of] the principal portfolio manager (not the

Borrower) for the Lender that the Lender has no need of the cash lent to the Borrower and that

the Loan will have no adverse effect on the Lender[.]"

10

36. Law Firm A never contacted Falcone, and never did any due diligence regarding the proposed transaction with SSF. Instead, Law Firm A relied on oral representations from Harbinger personnel, primarily Jenson. Based on these representations, and with the caveat that any advice from Law Firm A "is dependent on the accuracy of such statements," Law Firm A provided a draft memorandum (the "Draft Memorandum") to Harbinger on September 22, 2009. The cover page of the Draft Memorandum stated: "This is in draft form – we look forward to factual corrections and other comments so that we may move quickly to a final product." The Defendants never provided any factual corrections.

37. The Draft Memorandum advised that "it is reasonable for you to conclude that the Loan is consistent with Harbinger's fiduciary duty to the [SSF] Fund." Law Firm A further qualified its advice by stating that "[w]e have no ability to make economic determinations regarding the best interest of the Fund or the liquidity profile of the Fund's portfolio."

38. Law Firm A then condensed the Draft Memorandum into a PowerPoint. Both the Draft Memorandum and the PowerPoint were based on materially incorrect information and contained materially false statements. As a result, the Defendants knew or should have known that the Draft Memorandum and the PowerPoint were fundamentally flawed and should not have been relied upon.

39. On October 8, 2009, Jenson forwarded the PowerPoint to Falcone and asked that Falcone take a "careful read" of it. The next day, Jenson and Harbinger's in-house counsel reviewed the PowerPoint with Falcone in a brief meeting. Falcone asked no questions and gave final approval for the loan transaction.

40. After Falcone's approval, Law Firm A, in consultation with Jenson, finalized the loan agreement. The interests of SSF as the lender were not represented during the negotiation and

drafting of the loan agreement.

41. The Loan and Security Agreement dated October 14, 2009 (the "Loan Agreement") was signed by Falcone as borrower and Jenson, based on Falcone's approval, on behalf of SSF as the lender. The only pledged collateral for the loan was Falcone's interest in SSF.

42. The Loan Agreement provided that "[t]he Lender's counsel shall have provided advice to the Lender to the effect that the making of the Loan . . . would not be inconsistent with the Borrower's fiduciary obligation to the Lender." As the Defendants never appointed or consulted with a Lender's counsel, however, the Defendants never complied with this provision of the Loan Agreement.

43. The Loan Agreement provided that the interest rate to be paid on the loan was "the higher of" (1) the Applicable Federal Rate, which at the time was 2.66 percent, plus 1 percent; or (2) "the Lender's actual cost of funds as determined by the Lender in its reasonable discretion plus one percent." At the time, SSF was paying 7 percent on an outstanding loan, which provided a measure of SSF's cost of funds. The Defendants, however, did not use the "cost of funds" measure, and instead Falcone paid a highly favorable rate of 3.66 percent.

44. The day after the execution of the Loan Agreement, Jenson signed the wire instructions to transfer $113.2 million from an SSF account, and these funds were subsequently used to pay Falcone's personal tax liability.

45. After receiving Harbinger's instructions to transfer the funds, the general counsel of SSF's third-party service provider e-mailed Harbinger that "I must tell you that [the service provider] and its affiliates are concerned about this [loan] transaction and would advise against it if asked."

**Law Firm A's Advice Was Based on Inaccurate and Incomplete Facts**

46. The procurement of legal advice was an integral element of the Defendants' scheme. To ensure that they received the legal advice they needed, Jenson and Harbinger concealed and misrepresented facts in communications with Law Firm A.

47. Jenson and Harbinger's misrepresentations to Law Firm A are apparent from the Draft Memorandum and the PowerPoint. For example, the Draft Memorandum recited as factual predicates that SSF "is being maintained in highly liquid cash management instruments;" that the tax liability was "unexpected;" that Falcone's "failure to pay in a timely manner would likely lead to significant disruptions for [Harbinger] (both financial and reputational) and to the potentially material detriment of [SSF], as well as the other Harbinger funds;" and that the need for the loan "does not derive from [Falcone's] own 'poor planning.'" These representations in the Draft Memorandum were not accurate; however, the Defendants did not tell Law Firm A the correct facts or clarify these misstatements.

48. Similarly, the PowerPoint – which stated the "[g]eneral [r]ule" of "[n]o borrowings by any 'insider' from any fund" – established conditions for the potential transaction that the Defendants knew, or should have known, could not be met. For example, the PowerPoint made clear that the loan could not be made if there was "any doubt" that the fund needed liquidity; that the loan must be repaid "immediately" if the fund needed liquidity; and that Falcone had "no other viable source of funding."

**Misrepresentations and Omissions to Investors**

49. The Defendants made, or caused to be made, misrepresentations and omissions to investors concerning the SSF loan to Falcone.

50. Harbinger sent monthly SSF portfolio holdings reports to certain SSF investor

representatives. In late 2009, Jenson and Harbinger failed to include the loan in these holdings reports, even though Law Firm A had advised that Harbinger had to treat the loan to Falcone as an SSF investment. If Harbinger had followed Law Firm A's advice and treated the loan as a fund investment, the loan would have been disclosed as among the SSF's largest holdings.

51. Shortly after the loan closed, Falcone told an investor that other key investors were aware of the loan. Other investors, however, were not aware of the loan.

52. In or about December 2009, Jenson instructed Harbinger investor relations personnel that the loan was not a fund investment. As a result of this instruction, the investor relations personnel gave misleading and incorrect responses during conversations and communications with SSF investors.

53. On March 16, 2010, Jenson emailed "talking points" to Harbinger's investor relations personnel for use in responding to investor inquiries. The talking points stated that "[t]he loan was the only alternative to ensure that [Falcone] met his tax obligations," and that Falcone "only became aware of these tax liabilities in late 2009." In fact, Falcone had other alternatives to the loan from SSF and the Defendants knew about the substantial tax obligation at least six months before the loan.

54. The talking points also stated that the "[l]oan was thoroughly vetted and structured by outside legal counsel who determined it was in the best interests and benefit to the investors." Law Firm A, however, did no due diligence and never determined that the loan was in the best interests of investors. Jenson and Harbinger described the amount of collateral supporting the loan as being 15 times the amount of the loan, when, in fact, the collateral coverage was less than 2 times.

55. Similarly, Jenson provided Falcone with additional talking points for investor

communications that the Defendants knew, or should have known, contained incorrect and misleading statements.

56.  On May 12, 2010, Falcone wrote to SSF investors regarding a restructuring proposal. Falcone reported that greater than 80 percent of SSF investors chose to receive distributions rather than merge with HCP Fund I.  As a result, Falcone had to liquidate SSF, stating that "we are beginning the process of an orderly reduction to cash" of the SSF portfolio.  Despite the urgent need for cash to return to SSF investors, the Defendants failed to accelerate the repayment of the loan, as required by the Loan Agreement.

57.  In addition, in an email dated September 29, 2010, Falcone advised an investor representative that "we had vetted [the loan] extensively with outside counsel . . . The [loan], furthermore, was collateralized by all my holdings, essentially 14x."  Both statements were false. Law Firm A did no due diligence or vetting, and the collateral for the loan was limited to Falcone's interest in SSF, which was less than two times coverage.

58.  In the same e-mail, Falcone also acknowledged that the "[o]utside counsel structured the [loan] as an investment for the fund with terms advantageous to the fund like any other investment."  As noted above, the Defendants did not follow Law Firm A's advice to treat the loan as a fund investment.

59.  Falcone made his final loan repayment in March 2011, after becoming aware of the SEC's investigation. By not paying the "cost of funds" interest rate, as provided in the Loan Agreement, Falcone avoided paying millions of dollars in interest payments.

**The Preferential Redemption Scheme**

60.  Falcone and Harbinger engaged in another scheme that disadvantaged investors.  In early 2009, HCP Fund I, like many hedge funds following the 2008 credit crisis, experienced a sharp decline in assets under management.  As a result of investment losses in 2008, many investors were seeking to redeem their interests.

61.  To try to stabilize the situation, Falcone and Harbinger proposed a change to the fund's "gate," which limited the amount of money that an investor could redeem on any of its quarterly redemption dates.  Until March 2009, HCP Fund I had a "fund-level gate," which allowed the fund to limit redemption requests if the total redemptions sought by all investors exceeded 20 percent of the fund's total net assets on a given redemption date.

62.  In a letter dated March 9, 2009, Falcone and Harbinger sought to change this term to a more restrictive investor-level gate.  The investor-level gate would limit redemptions to 25 percent of each redeeming investor's total investment in the fund, regardless of the total redemptions sought on that redemption date.  The potential effect of the change from a fund-level gate to an investor-level gate would be to deny many investors the ability to access all of their funds at the next available redemption date.

63.  The proposed change in investors' redemption rights required investor consent.  As the date of the vote drew closer, there was concern that investors might not consent.  A Harbinger employee emailed that she was "very concerned about the timing of these changes [because] we need a bunch of [other investors] to say yes.  The [investor relations personnel] (who are always optimistic) are telling me that it will be near impossible to get the 2/3 votes offshore unless we threaten suspension .... If we don't get the votes, it will look bad."

64.  To secure consent, Falcone and Harbinger made side deals with some of their largest

investors, providing those investors with preferential liquidity in return for an affirmative vote. These side deals were with "sponsors" – large banks and investment firms that acted as representatives and intermediaries with Falcone and Harbinger on behalf of the sponsors' clients. Harbinger made these side deals in oral agreements and side letters between Falcone and Harbinger and at least three large sponsors, referred to herein as Sponsor A, Sponsor B and Sponsor C.

65.   In entering into these side deals, which amounted to undisclosed *quid pro quo* agreements to buy votes, Falcone and Harbinger concealed or failed to disclose material terms of such arrangements from the HCP Offshore Fund I board of directors, and to the other non-favored investors; failed to honor Most Favored Nation ("MFN") provisions with certain investors; and made misrepresentations and omissions of material facts to investors concerning the side letters and MFNs.

### *Quid Pro Quo* with Sponsor A

66.   As of March 2009, Sponsor A, with approximately $300 million invested in HCP Fund I, was the largest independent investor in the fund.  In mid-March 2009, an in-house lawyer at Sponsor A told Harbinger that approximately $50 million of its accounts would vote against the proposal.

67.   A senior Harbinger employee (the "Senior Employee"), on Falcone's behalf, then offered to redeem those dissenting accounts in full as of June 30, 2009, if the dissenting investors consented to the restrictions.  Sponsor A agreed and caused the dissenting accounts to change their vote and consent to the restrictions.

68.   To provide the agreed-upon redemptions, Harbinger sought to use HCP Fund I's "compulsory redemption" authority.  A compulsory (or mandatory) redemption typically occurs

when a fund requires an investor to redeem its investment in the fund.

69.   Only the HCP Offshore Fund I board of directors, however, could authorize a compulsory redemption on behalf of the fund.  In June, when Jenson discussed the proposed compulsory redemptions with Falcone and the Senior Employee, and noted that board action would be necessary, neither Falcone nor the Senior Employee advised Jenson of the *quid pro quo* arrangement with Sponsor A.

70.   Jenson then conveyed the request to the HCP Offshore Fund I board.  Accordingly, the HCP Offshore Fund I directors approved the compulsory redemption for Sponsor A's investors without knowing about Harbinger's side deal with Sponsor A.

**Side Letters with Sponsor A**

71.   Harbinger also entered into two related side letters with Sponsor A in connection with the vote, each granting preferential redemption rights that Harbinger did not disclose to the HCP Offshore Fund I board.

72.   On March 25, 2009, Falcone, on behalf of Harbinger, and Sponsor A executed a side letter providing that as of June 30, 2009, all Sponsor A-affiliated investors would be entitled to either redeem their investment from the HCP Fund I, without application of the investor-level gate; or invest in a new separately managed account, managed by Harbinger, that would hold only Sponsor A-affiliated investors' assets.  Further, the side letter granted Sponsor A additional preferential rights.

73.   Harbinger did not disclose the side letter to the HCP Offshore Fund I board of directors, even though the side letter provided Sponsor A-affiliated investors with preferential rights in the HCP Offshore Fund I, effectively circumventing the investor-level gate.

74.   Harbinger entered into a second side letter with Sponsor A on July 31, 2009, and, once

18

again, failed to disclose the second side letter to the HCP Offshore Fund I board of directors. The second side letter effectively terminated the March 25, 2009 side letter and also granted preferential redemption rights to Sponsor A-affiliated investors.

75. Sponsor A-affiliated investors received approximately $65 million as of December 31, 2009, pursuant to the preferential rights Harbinger granted without having obtained board approval.

### Quid Pro Quo with Sponsor B

76. Harbinger also entered into a *quid pro quo* arrangement with Sponsor B. Harbinger granted Sponsor B preferential liquidity rights in return for Sponsor B-affiliated investors' consent to the gate proposal and did not disclose the agreement to the fund's board of directors. Falcone contacted Sponsor B in February 2009 – in advance of the investor letter – and, according to an internal February 27 e-mail, Falcone "got [Sponsor B] to say yes to the vote."

77. On March 19, 2009, Falcone learned that Sponsor B would consent to the gate proposal under certain circumstances. Sponsor B subsequently sent Harbinger an e-mail with a list of demands.

78. On March 25, 2009, Harbinger and Sponsor B agreed to the terms of the side letter. The side letter included a provision allowing Sponsor B to treat "the various separate investments" made by Sponsor B-affiliated investors in the HCP Fund I "as if they were a single investment" for the purposes of calculating the investor-level gate ("Account Aggregation Right"). While the HCP Offshore Fund I board ultimately ratified the Sponsor B side letter, Harbinger never made the directors aware of a connection between the side letter and Sponsor B's vote on the gate proposal. Sponsor B subsequently used their Account Aggregation Right to redeem certain Sponsor B-affiliated investors in full, effectively circumventing the investor-level

gate.

### *Quid Pro Quo* with Sponsor C

79. Falcone also agreed to a preferential redemption for certain Sponsor C-affiliated investors in return for Sponsor C's vote on the gate proposal. Falcone and Harbinger failed to disclose the arrangement to the HCP Offshore Fund I board of directors.

80. In an attempt to secure the vote of all Sponsor C-affiliated shareholders, Falcone spoke with certain Sponsor C employees and agreed to waive the notice provisions for approximately $3 million of Sponsor C-affiliated accounts.

81. This allowed Sponsor C to redeem such accounts as of March 31, 2009, notwithstanding that Sponsor C had not submitted redemptions for such accounts within the ninety day notice window required by the fund offering documents. The benefit of such a waiver was that March 31, 2009 was the last redemption date on which an investor could redeem shares without application of the 25 percent investor-level gate.

82. Once again, despite the fact that only the HCP Offshore Fund I board of directors – and not Harbinger or Falcone – was permitted to do so, Falcone and Harbinger waived the notice period and then failed to disclose to, or obtain ratification from, the HCP Fund I board of directors.

### False Statements with Respect to the Preferential Redemption Scheme

83. Falcone and Harbinger provided incomplete and misleading disclosure in the March 9, 2009 letter which proposed the investor-level gate to investors. Falcone and Harbinger failed to disclose to HCP Fund I investors that they intended to trade preferential liquidity terms for key investors' votes in favor of the investor level gate proposal. Knowledge of such *quid pro quo* arrangements was material and Falcone and Harbinger did not disclose these side deals to all

SSF investors.

84.  On March 10, 2010, Jenson and Harbinger also sent a letter to the offshore board in connection with the HCP Fund I's 2009 audited financial statements in which Harbinger represented that "[t]here have been no Side Letters entered into on behalf of the Funds that have not been brought to the attention of, signed, and/or approved by the directors." In view of the undisclosed agreements and side letters described above, this representation was false and misleading.

85.  Harbinger failed to honor MFN provisions in side letter agreements with HCP Fund I investors. The HCP Fund I governing documents allowed the fund to enter into side letters with investors, including those containing MFN provisions. For example, a May 3, 2007 side letter between HCP Fund I and Sponsor D, a registered investment adviser, contained an MFN provision that required Harbinger to notify Sponsor D within 10 days if Harbinger granted more favorable terms, including withdrawal terms, to other investors. Sponsor D-affiliated investors retained the option to increase their investment and obtain the more favorable terms. Notwithstanding these obligations, Harbinger did not notify Sponsor D of Sponsor B's side letter containing the superior Account Aggregation Rights or Sponsor A's preferential redemption rights contained in its side letters and in the compulsory redemptions.

86.  Similarly, Harbinger failed to honor the MFN provision contained in Sponsor B's March 25, 2009 side letter. The provision stated that if "at any time" an investor with the same or smaller investment than the Sponsor B-affiliated investors entered into an agreement "that has the effect of establishing rights or otherwise benefiting the investor" with respect to "withdrawals or redemptions, other liquidity terms or information rights" that are more favorable than those granted to Sponsor B, Harbinger would provide Sponsor B notice of and the right to

elect to receive such rights. Sponsor B became the largest HCP Fund I investor following the June 30, 2009 redemptions of Sponsor A's investors. Harbinger, however, failed to provide Sponsor B notice of the preferential redemption rights as required by Sponsor A's July 31, 2009 side letter, specifically the right to redeem up to 75 percent of an investor's capital account upon thirty days written notice.

87. Harbinger also failed to accurately disclose these side letters in response to investors' annual questionnaires. Certain of these investor questionnaires required Harbinger to disclose if Harbinger had entered into side letters with more favorable terms. Harbinger gave false and misleading responses in certain of these questionnaires regarding the favorable redemption and liquidity terms granted.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (Falcone and Harbinger)

88. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 87.

89. Defendants Falcone and Harbinger, directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities.

90. By reason of the foregoing, Falcone and Harbinger, singly or in concert, directly or

indirectly, have violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
#### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
#### (Falcone and Harbinger)

91.  The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 90.

92.  Defendants Falcone and Harbinger, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of securities.

93.  By engaging in the conduct alleged above, defendants Falcone and Harbinger violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

### THIRD CLAIM FOR RELIEF
#### Control Person Liability under Section 20(a) of the Exchange Act for Violations of Section 10(b) of the Exchange Act and Rule 10b-5
#### (Falcone)

94.  The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 93.

95.  By engaging in the conduct alleged above, Harbinger violated Exchange Act Section 10(b), and Rule 10b-5 thereunder.

96.  Falcone is a control person of Harbinger.

97.  Falcone had actual knowledge of Harbinger's violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a), (b) and (c) thereunder, and Falcone was a culpable participant in these violations.

98.  By reason of the foregoing, Falcone is jointly and severally liable as a control person for violations by Harbinger of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)].

### FOURTH CLAIM FOR RELIEF
**Violations of Sections 206(1) and 206(2) of the Advisers Act
(Falcone and Harbinger)**

99.  The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 98.

100. Falcone and Harbinger at all relevant times were investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)].

101. As investment advisers to SSF and HCP Fund I, Falcone and Harbinger owed the SSF and HCP Fund I (and the board of directors of HCP Fund I) duties of utmost good faith, fidelity, and care to make full and fair disclosure to them of all material facts – including any conflicts or potential conflicts of interests – as well as the duty to act in the best interests of SSF and HCP Fund I, and not to act in Falcone and Harbinger's own interests to the detriment of SSF and HCP Fund I.

102. Falcone and Harbinger breached their fiduciary duties to SSF and HCP Fund I, engaged in fraudulent conduct and engaged in a scheme to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

## FIFTH CLAIM FOR RELIEF
### Violations of Sections 206(4) and Rule 206(4)-8 of the Advisers Act
### (Falcone and Harbinger)

103.  The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 102.

104. By engaging in the conduct described above, Falcone and Harbinger, while acting as investment advisers to HCP Fund I and SSF: (1) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to investors or prospective investors in SSF and HCP Fund I; and (2) otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive or manipulative with respect to investors or prospective investors in SSF and HCP Fund I.

105. By reason of their actions alleged herein, Falcone and Harbinger violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 thereunder,
### (Jenson)

106. The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 105.

107. By engaging in the conduct described above, Jenson knowingly or recklessly provided substantial assistance to Falcone and Harbinger in their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

108.  By engaging in the conduct described above, Jenson aided and abetted Falcone and

Harbinger's violations of Section 10(b) of the Exchange Act, [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for Violations of Advisers Act Sections 206(1) and (2)
### (Jenson)

109. The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 108.

110. Jenson at all relevant times was an associated person of Harbinger, an investment adviser.

111. By engaging in the conduct described above, Jenson knowingly or recklessly provided substantial assistance to Falcone and Harbinger in their violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and (2)].

112. By engaging in the conduct described above, Jenson aided and abetted Falcone and Harbinger's violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and (2)].

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for Violations of
### Advisers Act Section 206(4) and Rule 206(4)-8 thereunder
### (Jenson)

113. The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 112.

114. Jenson at all relevant times was an associated person of Harbinger, an investment adviser.

115. By engaging in the conduct described above, Jenson knowingly or recklessly provided substantial assistance to Falcone and Harbinger in their violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

116.  By engaging in the conduct described above, Jenson aided and abetted Falcone and

Harbinger's violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8

thereunder [17 C.F.R. 275.206(4)-8].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Falcone, Harbinger and Jenson from future violations of the

federal securities laws as alleged in this complaint;

### II.

Ordering Falcone, Harbinger and Jenson to disgorge any ill-gotten gains from their

violative conduct alleged in this complaint, plus prejudgment interest;

### III.

Ordering Falcone, Harbinger and Jenson to pay civil monetary penalties pursuant to

Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21(d) of the Exchange Act [15 U.S.C.

§ 78u(d)], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9];

### IV.

Permanently barring Falcone from serving as an officer or director of an issuer that has a

class of securities registered pursuant to Section 12 of the Exchange Act, as amended, or that is

required to file reports pursuant to Section 15(d) of the Exchange Act, pursuant to Section

21(d)(2) of the Exchange Act; and

## V.

Grant such other and further relief as the Court may deem just and proper.

Dated: June 27, 2012
       New York, New York

SECURITIES AND EXCHANGE COMMISSION

By:_____

Bruce Karpati
Chief, Asset Management Unit
New York Regional Office
3 World Financial Center
New York, NY  10281
(212) 336-1100
Attorney for Plaintiff

Of Counsel:
Ken C. Joseph
David Stoelting
Mark D. Salzberg